# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RAUL KOPALEISHVILI, *on behalf of*     :     Case No. 1:17-cv-702
*himself and others similarly-situated*,     :
                                        :     Judge Timothy S. Black
      Plaintiff,                :
                                        :
vs.                                     :
                                        :
UZBEK LOGISTICS, INC., *et al.*,        :

      Defendants.

## ORDER GRANTING PLAINTIFF'S
## MOTION FOR CLASS CERTIFICATION (Doc. 38)

This civil case is before the Court on Plaintiff's motion for class certification
(Doc. 38) and the parties' responsive memoranda (Docs. 42, 44).

## I. BACKGROUND

Plaintiff Raul Kopaleishvili brings this action on behalf of himself and those
similarly situated setting forth a single breach of contract claim against his former
employers, Defendants Uzbek Logistics, Inc. ("Uzbek Logistics") and Uzbek Transport
Express, LLC ("Uzbek Transport"). Plaintiff alleges that Defendants breached their
employment contracts by paying truck drivers a per-mile rate based on "practical miles,"
calculated using an atlas, MapQuest, or Google Maps, rather than based on the "actual
miles" they drove. (Doc. 1 at ¶¶ 30-38). Plaintiff alleges that as a result of being paid
based on practical miles, his "compensation was regularly short by at least 100 miles in
every payment." (*Id.* at ¶ 34).

Two brothers, Ulugbek Aripov ("Ulugbek") and Otabek Aripov ("Otabek"), started freight-brokering companies between 2008 and 2011.  Ulugbek created Uzbek Transport in 2008, which employed truck drivers on a contract-basis to haul freight from 2008 through 2011.  (Ulugbek Depo. at 12, 15, 17, 26, 30).  While in operation, Uzbek Transport had approximately five to six contract drivers at a given time.  (*Id.* at 26, 34). Ulugbek testified that he used written contracts for his drivers, which indicated a "per mile" rate of pay; although he had oral agreements with a couple of the drivers whom he knew personally.  (*Id.* at 36-37).  The written contracts were informal in nature.  Ulugbek testified that he would write up the agreement "on a piece of paper, saying I, whatever the driver's name is, agree to get paid this much per mile," with the driver and Ulugbek signing the paper.  (*Id.* at 37).

To determine the mileage for purposes of compensation, Ulugbek used a "truckers' atlas," cross-checking the distance with MapQuest.  (*Id.* at 38-40).  Once a week, Ulugbek would have a conversation with his drivers about their pay, with both parties agreeing to use the estimate from the atlas over that from MapQuest "90 percent of the time."  (*Id.* at 40-41).  During this period, Uzbek Transport was not using GPS navigation or tracking.  (*Id.* at 41).  Ulugbek would use an Excel spreadsheet to track mileage per load and to calculate pay.  (*Id.* at 47).  He would print off the sheets and give these to his drivers along with their checks.  (*Id.*).

In approximately 2013, Uzbek Transport began "booking freight" through another company, Uzbek Logistics, formed by Otabek in 2011.  (Ulugbek Depo. at 16-17, 31; Otabek Depo. at 14, 18-19, 27-31, 39).  The two companies had a lease agreement

whereby Uzbek Transport made bookings and then passed the work along to Uzbek Logistics to haul the freight through its contracted trucks and drivers. (Ulugbek Depo. at 17). Uzbek Transport ceased operations at the end of 2016. (*Id.* at 16, 24).

Uzbek Logistics, like Uzbek Transport, paid contract drivers a "per mile" rate that would be written on the drivers' employment contracts and calculated based on "practical miles." (Otabek Depo. at 46-47, 67). Uzbek Logistics began using more formal contracts, like the one signed by the Plaintiff, in 2016. (*Id.* at 44, 74). Unlike Uzbek Transport, which relied primarily on a trucker's atlas for its mileage estimates, Uzbek Logistics used Google Maps to calculate practical miles for purposes of compensation. (*Id.* at 47-48).

Otabek explained in his deposition that after being hired, a driver would go through "orientation," during which Uzbek Logistics would explain that pay is based on practical miles. (*Id.* at 59-61). At Uzbek Logistics, drivers were required to submit an envelope containing their log book, fuel receipts, a blank space to note the route taken, and a comment sheet on which drivers could note any additional expenses incurred or note if they ended up taking an alternate route or detour warranting greater compensation. (*Id.* at 63-65, 67). The log books also contained a place for drivers to write down the actual miles driven for purposes of fuel taxes. (*Id.* at 72). According to Otabek, most of the drivers did not record their actual miles in their log books. (*Id.* at 90-91). Uzbek Logistics would send its drivers a "settlement sheet," which included a breakdown of their mileage and compensation. (*Id.* at 65). Around April of 2017, Uzbek Logistics

stopped using contract drivers and switched exclusively to owner-operated drivers.[1]  (*Id.* at 41).  In January 2017, Uzbek Logistics entered into a lease agreement with a third company called On Time Trans.  (*Id.* at 79).  In April of 2017, Otabek gave On Time Trans permission to include "Uzbek Logistics" in the header of On Time Trans' contracts, and pursuant to Otabek's suggestion, the contracts expressly stated that drivers would be paid a certain amount "per mile" "based on practical miles."  (*Id.* at 97-99).

Plaintiff, Raul Kopaleishvili, allegedly worked as a contract truck driver for Uzbek Transport and Uzbek Logistics from June 2016 to January 2017.  (Doc. 38 at 17).[2] Plaintiff's employment contract states, "I understand that my rate of pay will be $0.50 Per Mile . . ."  (Doc. 1-1 at ¶ 5).  Prior to being hired, Plaintiff spoke on the phone several times with Otabek, the owner of Uzbek Logistics, and also met with him in Cincinnati for an interview.  (Raul Depo. at 58, 63-64).  According to Plaintiff, Otabek did not explain how compensation would be calculated beyond stating he would be paid fifty cents per mile.  (*Id.* at 64).  However, Otabek claims that Plaintiff went through the standard orientation, during which Otabek would have explained that Uzbek Logistics uses Google Maps to calculate mileage for purposes of compensation.  (Otabek Depo. at 61, 73).

---

[1] "Owner-operators" refers to drivers who own their own trucks.  Uzbek Transport and Uzbek Logistics did not pay this category of drivers based on a per-mile rate.  (Otabek Depo. at 49)

[2] Defendants assert in a footnote that Plaintiff improperly conflates Uzbek Transport and Uzbek Logistics.  (Doc. 42 at 9 n.1).  However, Defendants do not substantively argue that Plaintiff has improperly named Uzbek Transport as a defendant, despite describing Plaintiff's contract as having been with Uzbek Logistics only.  Because this issue concerns the merits and was not fully raised or briefed by the parties, the Court declines to consider it at this time.

Plaintiff, based on his prior experience, was under the impression his pay would be calculated using actual miles driven based on his odometer.  (Raul Depo. at 52, 61).

Noticing the discrepancy between the actual miles he drove and amount he was paid, Plaintiff asked his employer why he was not being paid more.  (*Id.* at 49).  After approximately one to two months, Plaintiff was "clearly told" that Uzbek Logistics calculates pay based on Google Maps, not actual miles driven.  (*Id.* at 50).  Plaintiff initially took photographs of his odometer to track his mileage but stopped consistently tracking his odometer miles after he was told that pay would be calculated using Google Maps.  Plaintiff claims that he was underpaid by at least $6,372.25 having been paid based on practical miles rather than actual miles.  (*Id.* at 166).

The complaint states that the putative class consists of "each and every other person who worked for the Defendants as a truck driver."  (Doc. 1 at ¶ 14).  Plaintiff's motion for class certification proposed the following revised class definition:

> [A]ll individuals hired as truck drivers by Uzbek Logistics, Inc. and/or Uzbek Transport Express, LLC, from April 2009 through March 2018 (the "Class Members").  Corporate officers, shareholders, directors and administrative employees shall not be part of the proposed class.

(Doc. 38 at 1, 12).  To address certain deficiencies raised by Defendants in response to Plaintiff's motion for class certification, Plaintiff, in his reply brief, further refined the class definition as follows:

> All drivers who entered into written contracts with Uzbek Logistics, Inc. and/or Uzbek Transport Express, LLC since April 2009 requiring payment on a "per mile" basis.  The class does not include those drivers whose contracts expressly state compensation will be paid "based on practical miles."

5

(Doc. 44 at 9). Thus, the Court will treat Plaintiff's motion for class certification as a motion to certify the amended class definition proposed in Plaintiff's reply brief. *Cf. Cowan v. Nationwide Mut. Ins. Co.*, No. 2:19-cv-1225, 2019 WL 4667497, at *7 (S.D. Ohio Sept. 25, 2019) (considering narrowed class definition proposed in plaintiff's reply brief for purposes of class certification under the Fair Labor Standards Act); *see also In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 402 (S.D. Ohio 2007) (considering "reply-memorandum modification" to class definition).[3]

## II. STANDARD OF REVIEW

Class actions constitute "an exception to usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1978). "In order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). To obtain class certification, a plaintiff must meet each of the four prerequisites contained in Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequate representation. *Zehentbauer Family Land, LP v. Chesapeake Expl. LLC*, 935 F.3d 496, 503 (6th Cir. 2019).

---

[3] Defendants did not seek leave to file a sur-reply or supplemental memoranda to respond to Plaintiff's revised class definition.

"[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This rigorous analysis may require "the court to probe behind the pleadings before coming to rest on the certification question." *Id.* However, courts do not have "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

In addition to meeting the four criteria in Rule 23(a), a plaintiff must demonstrate that the putative class complies with at least one of the requirements of Rule 23(b). *Id.* Here, Plaintiff seeks certification of the class pursuant to Rule 23(b)(3). (Doc. 38 at 35). A court may certify a class under Rule 23(b)(3) only if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, a Rule 23(b) class must also meet an implied ascertainability requirement. *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017).

### III. ANALYSIS

A. Ascertainability

Before turning to the requirements of Rule 23(a), the court will first consider whether the proposed class is ascertainable—that is, whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012). A class is sufficiently ascertainable when

class members can be identified based on objective criteria. *See Rikos v. P&G*, 799 F.3d
497, 526 (6th Cir. 2015) (affirming finding of ascertainability where the identification of
class members would involve "substantial review" of records, supplemented by the use of
receipts and affidavits).  The purpose of the ascertainability requirement is to ensure
administrative feasibility, including the ability to notify absent class members in order to
provide them an opportunity to opt out and avoid the potential collateral estoppel effects
of a final judgment. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016).

To reiterate, Plaintiff seeks certification of the following class:

> All drivers who entered into written contracts with Uzbek
> Logistics, Inc. and/or Uzbek Transport Express, LLC since
> April 2009 requiring payment on a "per mile" basis.  The
> class does not include those drivers whose contracts expressly
> state compensation will be paid "based on practical miles."

(Doc. 44 at 9).  Defendants objected to a finding of ascertainability based on Plaintiff's
prior class definition, which would have included drivers with oral agreements, as well as
"owner-operators" who were not paid on a per-mile basis.  Plaintiff's narrower class
definition adequately addresses these objections, as it is limited to drivers with written
contracts containing the relevant "per mile" language.  Consequently, class members can
be identified based on the objective criterion of whether they had a written agreement
with Defendants specifying a "per mile" rate of pay (excluding drivers with contracts
expressly stating pay is "based on practical miles").

Another challenge to ascertainability raised by Defendants is the fact that Plaintiff
has not offered copies of contracts from drivers for Uzbek Transport during the time it
was operational.  During his deposition, Ulugbek testified that he does not have copies of

Uzbek Transport's contracts. (Ulugbek Depo. at 37). However, poor record keeping on the part of a defendant generally does not excuse him from potential liability. "It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result is small monetary losses to large numbers of people." *Rikos*, 799 F.3d at 525. Thus, "[t]o allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies." *Id.* at 525-26.

Therefore, affidavits may be used to supplement the record to the extent Defendants are not able to produce the contracts of self-identified class members who drove for Uzbek Transport. *See id.* at 526 (approving the use of receipts, affidavits, and a special master to review individual claims). This is not a case like *Sandusky*, where the court rejected the plaintiffs' proposal to supplement fax records of with affidavits on the basis that putative class members were "not realistically expected to remember receiving a one-page fax sent seven years ago." 863 F.3d at 472. Former drivers for Uzbek Transport are likely to recall the fact of their employment. In addition, Ulugbek testified that he had a consistent practice of paying drivers a "per mile" rate written on a piece of paper with the exception of "a couple" of drivers whom he knew personally and with whom he merely had oral agreements. (Ulugbek Depo. at 36-37). Accordingly, the proposed class is sufficiently definite and ascertainable.

B.     Commonality and Predominance

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Although the Rule "speaks of 'questions' in the plural," the Sixth Circuit has held

that "one question common to the class" satisfies this requirement. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). As the Supreme Court explained in *Tyson Foods, Inc. v. Bouaphakeo*, "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012)).

Commonality does not require "the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Zehentbauer*, 935 F.3d at 503 (quoting *Wal-Mart*, 564 U.S. at 350). Said another way, commonality is met when determining the "truth or falsity" of a common contention "will resolve an issue that is central to the validity of each one of the claims in one stroke," advancing the litigation. *Wal-Mart*, 564 U.S. at 350; *Sprague*, 133 F.3d at 397.

At the certification stage, a plaintiff need not show that "all or most class members were in fact injured to meet this requirement." *Rikos*, 799 F.3d at 505. Rather, a plaintiff must demonstrate "that they *can prove* . . . that all members of the class have suffered the same injury." *Id.* at 505, 522. In addition, class members "need not be identically situated to meet the commonality requirement." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 183 (S.D. Ohio 2012) (internal quotations omitted).

"Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Zehentbauer*, 935 F.3d at 503 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). In order to assess predominance, "[a] court must first *characterize* the issues in the case as common or individual and then *weigh* which predominate." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018) (quoting 2 W. Rubenstein, Newberg, *Newberg on Class Actions* § 4:50 (5th ed. 2010)). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quoting *Bouaphakeo*, 136 S. Ct. at 1045).

Plaintiff asserts that the commonality requirement is satisfied, because the putative class members' claims arise from a "common wrong"—Defendants' failure to pay drivers based on actual miles driven under their contracts—which can be proven based on common evidence. (Doc. 38 at 27-28). Further, Plaintiff argues that common question of whether Defendants breached their contracts by paying drivers based on practical miles will predominate over individual questions. (*Id.* at 28-29).

Defendants argue that the issue of breach is not capable of class-wide resolution and that individualized issues will dominate the litigation. First, Defendants assert that the absence of a common contract precludes a finding of commonality; specifically

11

noting that the Court will need to consider testimony of individual drivers who had oral agreements in order to discern the terms of those agreements. (Doc. 42 at 17-18).

Second, Defendants claim that because the contacts are ambiguous, extrinsic evidence will be needed to interpret the meaning of the phrase "per mile." According to Defendants, class certification is inappropriate because the extrinsic evidence would include individualized considerations such as how the contract was explained to each driver, whether each driver complained about being shorted pay, and the drivers' individual habits of recording mileage. (*Id.* at 21, 24-25). Relatedly, Defendants assert that the putative plaintiffs likely had different understandings of how their mileage would be measured for purposes of compensation (*i.e.*, that some drivers understood pay to be based on practical miles), rendering the question breach incapable of a common answer. (*Id.* at 22) (citing depositions of two other drivers, Stephen Bay and Donna McCracken).

Third, Defendants argue that the class should not be certified because determining whether each putative class member incurred damages as a result of the alleged breach of contract will involve individualized calculations, and because the Court will need to consider Defendants' affirmative defenses of laches, waiver, unclean hands, estoppel, or accord and satisfaction on a case-by-case basis. (*Id.* at 28-29).

For the reasons stated below, the Court finds that Plaintiff has demonstrated both commonality and predominance.

### 1. Materially similar contracts

Cases involving the interpretation of a form contract are "are particularly suited for class treatment." *Cowit v. Citimortgage, Inc.*, No. 1:12-cv-869, 2013 WL 940466, at

*6 (S.D. Ohio Mar. 8, 2013). This is because such contracts are "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the terms of the standard terms of the writing." *See Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 581 (E.D. Mich. 2004); *see also Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1102 (7th Cir. 2019) (when a form contract is "almost universally signed without negotiation or modification, there is no reason to think that the interpretation of the provision will vary from one signatory to another, and therefore the issue is one that is capable of a common answer . . . ."); *see also Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").

Plaintiff's narrowing of the class definition to include only those drivers with written contracts defeats Defendants' argument that because some drivers merely had oral "handshake" agreements, the putative class members did not all sign materially similar contracts. The class definition's exclusion of those drivers who signed the latest version of the contracts expressly providing that the per mile rate would be "based on practical miles," which came into use in April of 2017, further ensures that the class consists only of those drivers whose contracts stated a per mile rate without specifying how mileage would be measured. The contracts captured by the class definition would include Ulugbek's informal, written contracts, as well as Otabek's informal, written contracts (using the drivers' applications) and Otabek's later, more formal contracts (like the one signed by Plaintiff). Although the contracts varied somewhat in their level of

13

formality and substance, each contract contained the material "per mile" language without explaining how mileage would be measured. Further, although there is evidence that Plaintiff negotiated his rate of pay (*See* Raul Depo. at 15), there is no evidence in the record that the method of measuring miles for purposes of pay (i.e. actual versus practical) was up for negotiation for Plaintiff or any of the putative class members. Thus, each driver signed materially similar contracts.

> 2. Ambiguity

The Court will next address Defendants' argument that breach is not a common issue due to the ambiguous nature of the contracts and resulting need to consider individualized extrinsic evidence. When a contract provision is ambiguous, it is possible the question of breach will no longer be capable of class-wide resolution, as the answer may vary from class member to class member. Yet, the need to consider extrinsic evidence is not automatically fatal to class certification. *Red Barn*, 915 F.3d at 1102. Courts have found that when a form contract is ambiguous and the record indicates that the meaning of the contract varied across class members, individual questions will likely predominate. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030-31 (8th Cir. 2010); *Axiom Inv. Advisors, LLC v. Deutsche Bank*, No. 15-cv-9945, 2018 WL 4253152, at *8 (S.D.N.Y. Sep. 6, 2018); *Monaco v. Bear Stearns Cos., Inc.*, No. 9-cv-5438, 2012 WL 10006987, at *6-7 (C.D. Cal. Dec. 10, 2012). The potential challenges to class treatment associated with extrinsic evidence are magnified when a court must apply the law of several states, as it has been shown that state law varies with respect to when and

what types of extrinsic evidence may be considered. *See, e.g.*, *Bowers*, 219 F.R.D. at 583.

      i.  Choice of law

   Because this action was originally filed in the United States District Court for the Eastern District of New York and then transferred to the Southern District of Ohio on the basis of forum non conveniens pursuant to 28 U.S.C. § 1404(a), this Court must apply the conflict of law rules of New York. *See In re Commercial Money Ctr., Inc.*, 603 F. Supp. 2d 1095, 1099 (N.D. Ohio 2009) ("Where venue has been transferred to a federal court sitting in a different state [ ] such a transfer does not change the state substantive law applicable in a diversity case." (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964))).

   In contract cases, New York courts apply what is called the "center of gravity" or "grouping of contracts" test.[4] *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 822 F.3d 620, 641 (2d Cir. 2016) (citing *Allstate Ins. Co. v. Stolarz*, 613 N.E.2d 936, 939 (N.Y. 1993)). This test "gives . . . the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context," which "allow[s] the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation." *Id.* (citing *In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1179 (N.Y. 2011)). "Under this approach, the spectrum of significant contacts—rather than a single possible fortuitous event—may be considered." *Id.* (citing *Stolarz*, 613 N.E.2d at 939). In making this assessment, courts consider factors such as

---

[4] None of the parties assert that the contracts included a choice of law provision.

the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.  *Id.* (citing *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 151-52 (2d Cir. 2008)).

Applying the center of gravity or grouping of contacts test, the Court finds that Ohio law would govern the claims of each class member.  Defendants are headquartered in and conduct business from Ohio.  Ulugbek would first speak with prospective drivers on the phone and then meet with them in person, often at a local McDonalds, to sign an agreement.  (Ulugbek Depo. at 34-35).  The drivers would then undergo a drug test at a local clinic.  (*Id.* at 35).  The trucks used by Ulugbek were parked in Northern Kentucky when not in use.  (*Id.* at 44).  Otabek also met with drivers in Ohio for an "interview" and then gave them a driving test.  (Otabek Depo. at 58-59).  If hired, the drivers would then drive away in a truck on their first assignment.  (*Id.* at 59).  The named Plaintiff resides in New York, and it is unclear whether most of the putative class members live in Ohio or other states.

Considering the fact that the contracts were signed in Ohio where each driver traveled to meet Ulugbek and Otabek in person prior to being hired and the fact that Defendants are headquartered in and conducted business in Ohio, Ohio has the greatest interest in the interpretation of the contracts at issue.  In addition, because this case concerns how mileage was calculated for purposes of payment, which was done by Defendants out of Ohio, Ohio has the greatest interest in the resolution of the specific issue raised in the case.  Thus, if extrinsic evidence is introduced in this case, the Court

will not face the burden of sorting through multiple states' laws governing extrinsic evidence.

     ii.  Ohio contract law

   Under Ohio law, to succeed on a breach of contract claim, a plaintiff must show (1) that a contract existed, (2) that the plaintiff fulfilled his contractual obligations, (3) that the defendant failed to fulfill his contractual obligations, and (4) that the plaintiff incurred damages as a result of the defendants' failure. *Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009). Whether a contract is ambiguous is a question of law for the court to decide. *Savedoff v. Access Grp. Inc.*, 524 F.3d 754, 763 (6th Cir. 2009) (applying Ohio law). Undefined words in a contract or agreement must be given their ordinary and usual meaning "unless manifest absurdity results." *Sanitary Comm. Servs., Inc. v. Shank*, 566 N.E.2d 1215, 1219 (1991).

   When the parties dispute the meaning of their contract, the court must first consider the four corners of the document to determine if it is ambiguous. *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1012 (Ohio Ct. App. 2011). A contract provision is ambiguous "where the language of a contract is reasonably susceptible [to] more than one interpretation." *Geczi v. Lifetime Fitness*, 973 N.E.2d 801, 806 (Ohio Ct. App. 2012). When a contract is ambiguous, extrinsic evidence is admissible to ascertain the parties' intent. *Lutz v. Chesapeake Appalachia, LLC*, 71 N.E.3d 1010, 1013 (Ohio 2016). Such evidence can include: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to

their agreement." *Id.* (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)). Extrinsic evidence may also come in the form of evidence of trade usage within a particular industry, which is admissible to demonstrate that the parties "employed terms having a special meaning within a . . . particular trade or industry, not reflected on the face of the agreement." *Kenney v. Chesapeake Appalachia, LLC*, 31 N.E.3d 136, 147 (Ohio Ct. App. 2015) (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 151 (1978)).

Plaintiff argues that the plain meaning of "per mile" is actual miles driven. (Doc. 44 at 14). In reaching this conclusion, Plaintiff breaks down the phrase into each word, with "per" defined by the dictionary as "each," and "mile" referring to a unit of measurement. (*Id.*). Defendants assert that "per mile" is ambiguous and cannot be interpreted without examining evidence pertaining to each putative class member, including what was communicated to each class member prior to signing the agreement. (Doc. 42 at 24). Defendants further assert that the Court will need to examine "whether each putative class member took actions that indicated he or she, contrary to general industry understanding, understood payment was to be calculated on all odometer miles driven." (*Id.*) Such actions may include how each member was tracking his or her miles and whether a given driver complained to the Defendants about being underpaid. (*Id.*)

The contracts at issue in this case merely state that payment will be based on a "per mile" rate. Examining the entirety of the sample contract available to the Court does not provide further insight into the meaning of the phrase. (Doc. 1-1). Miles can be measured in any number of ways, such as by a truck's odometer, Google Maps (or an

equivalent), a paper atlas, *etc*.  Because the contract does not specify how miles were to

be measured for purposes of compensation, the phrase "per mile" will likely be found

susceptible to multiple, reasonable interpretations, necessitating the consideration of

extrinsic evidence.  Nevertheless, the Court finds that the common issue of breach

predominates.

iii.    Application

As noted above, ambiguity does not automatically render a breach of contract

claim ill-suited for class treatment.  Yet, when evidence in the record suggests that the

understanding of the contract varied from member to member, the question of breach

cannot likely be answered en masse.  For example, in *Monaco v. Bear Stearns*, the court

denied class certification in a case involving an ambiguous contract due to the

"variability of [the] evidence regarding the circumstances surrounding the formation of

the contract[.]"  2012 WL 10006987, at *6-7.  In this case, declarations of the named

plaintiffs revealed that each of the named plaintiff had a different understanding of the

terms of their respective loan agreements.  *Id.* at *6.  In addition, the plaintiffs' testimony

was contradicted by that of their brokers, who stated they warned plaintiffs about the

possibility of negative amortization.  *Id.*

Similarly, in *Axiom Inv. Advisors, LLC v. Deutsche Bank*, the court found

certification of a breach of contract claim inappropriate where extrinsic evidence

suggested that a substantial portion of putative class members understood the contract to

allow the challenged practice.  2018 WL 4253152, at *4.  In this case, *undisputed*

*evidence* demonstrated that the defendant had disclosed its practice "to at least a

19

significant number of customers" via an online publication. *Id.* at *7. Based on the evidence that many class members were aware of the defendant's practice, the court found that each member would have to show through "individualized extrinsic evidence that it had reached an understanding with the [defendant] that" the practice was prohibited. *Id.* at *8.

In so holding, the court distinguished the Second Circuit case, *In re U.S. Foodservice, Inc. Pricing Litigation*, in which the court held that "argument[s] as to the importance of individualized extrinsic evidence as to the contract claims" failed because the record lacked evidence that the class members' "contract negotiations or individualized conduct in performing pursuant to the contract tend[ed] to show either that the customer understood his contract to authorize the [practice] or that he otherwise acquiesced in them." *Id.* (citing *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 125 (2d Cir. 2013)).

In the instant case, evidence in the record does not indicate that the meaning of "per mile" varied from driver to driver. Defendants point to the depositions of two other drivers, Bay and McCracken, to demonstrate that drivers had differing understandings of their agreements. However, these two drivers apparently signed the latest version of the contracts, expressly stating that pay is "based on practical miles." (Doc. 44 at 15). As such, Bay and McCracken would not fall within the class definition, which excludes drivers who signed that version of the contract, and testimony regarding their subjective understanding is not relevant to evaluating whether the understanding of the contract varied from class member to class member.

20

Further, unlike in *Axiom*, there is not *undisputed evidence* that a *significant number* of class members were notified of Defendants' practice of paying based on practical miles prior to signing the contract. Both Defendants testified that they told all contract drivers that pay would be based on practical miles. Ulugbek testified he would tell drivers that the company used MapQuest when explaining what per mile meant. (Ulugbek Depo. at 37-39). And Otabek testified that he, himself, or one of his two recruiters would sit down with each driver for an "orientation" during which it would be explained that pay was based on Google Maps. (Otabek Depo. at 60-62). However, Plaintiff disputes this account and testified that Otabek did not explain how mileage would be measured for purposes of compensation. (Raul Depo. at 63-64).

Nor does Plaintiff's course of performing the contract indicate he understood pay to be based on practical miles. To the contrary, the named Plaintiff's actions tend to support his claim that he entered the contract with the understanding that pay would be based on actual miles, measured by his odometer. Plaintiff testified that he initially took photographs of his odometer and only stopped "pointing to them" after Otabek told him to "forget about [the] odometer." (*Id*. at 53-55). Defendants highlight Plaintiff's testimony that his pay would not be delayed if he was late in turning in his "trip sheets," which may go to show that he was aware that pay was based on an estimated number of miles (*see id*. at 99-101); the argument being that Plaintiff would have been aware of the fact that his pay did not depend on his communicating to Defendants how many miles he actually drove. Yet, this testimony is consistent with Plaintiff's admission that *at some point* (approximately one month after driving for Defendants) he was "clearly told" that

pay was based on practical miles. That Plaintiff was put on notice after entering the contract that Defendants intended to pay him based on practical miles does not contradict Plaintiff's claim that he initially understood that pay would be based on actual miles.[5]

The record, as it has been developed thus far, does not indicate that the meaning of the contract varied from driver to driver, nor that a significant number of drivers likely shared Defendants' interpretation. Rather, the record demonstrates, unsurprisingly, that Plaintiff and Defendants have divergent interpretations of the contract. That breach is properly characterized as a common issue is most clearly demonstrated by the fact that both sides advocate for an interpretation of the contract that would apply to all class members—Defendants assert that "per mile" means per *practical mile* for each member, and Plaintiff asserts that the phrase means per *actual mile* for each class member.

In *Red Barn*, the Seventh Circuit reversed the district court's order to decertify a class that was based on the courts' concerns regarding the need to consider extrinsic evidence. 915 F.3d at 1101-102. The Court of Appeals reasoned that "[e]ven if the determination that the language is ambiguous as to when interest could accrue opens the

---

[5] Further, the instant case is factually distinguishable from *Avritt v. Reliastar Life Insurance Co.*, a case relied on by Defendants wherein the Eighth Circuit affirmed denial of certification of a breach of contract claim involving an ambiguous contract. 615 F.3d 1023 (8th Cir. 2010). Unlike in the instant case where the record supports Plaintiff's claimed interpretation of the contract, in *Avritt*, the record demonstrated that the named plaintiffs *did not* originally interpret the contract in the way they advocated in the course of the litigation, let alone that others shared their interpretation. *Id.* at 1030. Additionally, while the court in *Avritt*, was concerned about the need to consider extrinsic evidence, including how the policy was explained to each class member, this case involved "thousands of independent agents who did not follow a particular sales script." *Id.* at 1034.

22

door to extrinsic evidence to ascertain the intended meaning of that provision, the determination of its meaning would apply to all signatories and therefore would be capable of class-wide resolution." *Id.* at 1101.  The court reached this holding despite evidence that certain party representatives had conversations about defendant's practices after the contracts were executed.  *Id.*  Like in *Red Barn*, the contracts at issue in this case contain a uniform provision, with both sides advocating for a single interpretation.  Thus, the question of whether Defendants breached their contracts is one that will "generate [a] common answer[] apt to drive the resolution of the litigation."  *Id.* at 1102 (citing *Wal-Mart*, 564 U.S. at 349-50).[6]  Plaintiff has met the commonality requirement.

Furthermore, because the case hinges on the question of whether Defendants breached their contracts by paying drivers based on practical miles, predominance has also been met.  If, during the course of the case, it becomes apparent that the meaning of "per mile" varied among class members or that a substantial portion of members shared Defendants' interpretation, decertification of the class may be appropriate.  Accordingly, notwithstanding the distinct possibility that the Court will find the phrase "per mile" to be ambiguous, the question of breach is well-suited for class treatment and predominates over individual considerations.

Defendants' remaining arguments that certification should be denied based on the individualized nature of "damages" and Defendants' affirmative defenses are

---

[6] It is also worth noting the possibility that any ambiguity in the contract could be resolved by resorting to evidence of trade usage—alluded to by both parties—which could be applied class-wide.  *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d at 125 (finding generalized trade usage evidence capable of class-wide application).

23

unpersuasive. A plaintiff "need not prove that every element can be established by classwide proof," *Sandusky*, 863 F.3d at 468, and at the certification stage, a plaintiff does not need to prove that each class member was actually harmed. *Rikos*, 799 F.3d at 505. Moreover, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members." *Bouaphakeo*, 136 S. Ct. at 1045.

In support of their argument that the issue of whether each class member incurred damages (was paid less having been paid based on practical rather than actual miles) will be an individualized inquiry, Defendants assert that because showing harm is an element of a breach of contract claim, this issue relates to proving liability, not merely damages. (Doc. 42 at 27). Defendants also point to a lack of evidence regarding how many miles each putative class member actually drove. (*Id.* at 27-28). Plaintiff, on the other hand, claims that harm can be easily assessed using a class-wide formula (actual miles minus practical miles) and offers that the actual miles class members drove can be gathered from the records of total miles driven recorded for purposes of fuel tax reports, as well as from GPS data recorded by a company Otabek used to monitor his drivers. (Doc. 44 at 18).

The Court agrees with the Plaintiff that the methodology for determining harm is the same for all class members: subtracting practical miles (the mileage used to calculate their pay) from the total actual miles driven. This is a fairly straightforward calculation,

and would not require individualized, subjective analysis. For example, in *Zehentbauer*, the Sixth Circuit found, in dicta, that one of plaintiffs' theories of liability was not conducive to class treatment because it would require an individualized, multistep analysis for each class member. 935 F.3d at 505-06. Assessing plaintiffs' claim that the defendants sold oil and gas to midstream affiliates at below-market prices would entail "estimating the market prices for the raw oil and gas produced at each wellhead and comparing these estimated market prices calculated using the netback method." *Id.* at 506. In addition, the market prices depended on the quality of the oil and gas sold at each well, the quantity of the oil and gas sold, and the proximity of the well to processing facilities and downstream markets. *Id.*

By contrast, the court affirmed certification based on plaintiffs' theory of liability that defendants violated their lease language by improperly deducting post-production costs, because liability would "turn solely on whether the leases permit the defendants to deduct post-production costs" and "damages will be calculated by estimating what the royalty payments would have been if the defendants had not deducted post-production costs." *Id.* Under this theory, damages could be calculated without analyzing individual market prices of oil and gas at each well. *Id.*; *see also Rapp v. Green Tree Servs., LLC*, 302 F.R.D. 505, 510 (D. Minn. 2014) (denying certification in part because determining the "true" cost of the insurance for each class member would "depend on the location of the property, the value of the property, the personal characteristics of the borrower, the circumstances of the insurance market at the particular time and in the particular location, and countless other variables"); *Cancino v. Yamaha Motor Corp.*, No. 3:04-cv-274, 2010

WL 2607251, at *11 (S.D. Ohio June 24, 2010) (finding calculating damages would require individualized considerations such as how regularly a particular class member used his motorcycle and how long it took each motorcycle to get fixed).

The concern raised by Defendants is better characterized as evidentiary in nature—the problem being how the actual miles driven can be ascertained.  Defendants point to Plaintiff's testimony that he did not have records detailing the mileage he claims he was unpaid.  (Doc. 42 at 27 n.11).  However, Plaintiff also testified that he took pictures of his odometer until he was told after about a month that he would not be paid based on his odometer, at which point he continued to record his actual miles in a notebook, albeit less consistently.  (Raul Depo. at 49-52).

Plaintiff's suggestion that actual miles can be ascertained from GPS data from Uzbek Logistics' third-party monitoring company or from records of total miles driven recorded for fuel tax purposes do not appear to be foolproof solutions.  Deposition testimony indicates that only Uzbek Logistics used GPS tracking, and that many drivers did not record their miles driven for the fuel tax, despite being required to do so by law.  (Otabek Depo. at 90-91, 151).  In addition, these records of total miles driven would include more than a given driver's mileage from point A to point B, and thus would include more than their compensable mileage.  Yet, based on Plaintiff's theory that "per mile" means per actual mile, as measured by an odometer, other drivers would have likely kept some record of the actual miles they drove.  Moreover, where "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarly—[an alleged] failure of proof as to an element of the plaintiffs' cause of

26

action—<u>courts should engage that question as a matter of summary judgment, not class certification.</u>" *Bouaphakeo*, 136 S. Ct. at 1047 (emphasis supplied).

Finally, Defendants' argument that the need to consider their affirmative defenses on an individual basis precludes a finding of predominance is also unavailing. "Affirmative defenses may impede a finding of predominance where the defendant proffer[s] individualized and varying evidence to defend against claims of individual class members by showing what they knew or should have known about" the defendant's alleged conduct. *Sacred Heart Health*, 601 F.3d at 1178.  Here, Defendants assert that because each driver received a settlement statement on a weekly basis explaining the miles attributed to each trip, the drivers had actual knowledge of any perceived discrepancies.  (Doc. 42 at 28-29).  As such, Defendants' affirmative defense would apply uniformly across all class members and does not threaten the predominance of common questions.

C.     Superiority

To satisfy Rule 23(b)(3)'s superiority requirement a plaintiff must show that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Martin*, 896 F.3d at 415 (quoting *Amchem*, 521 U.S. at 516).  A class action should "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.*  Under this factor, the court should consider difficulties pertaining to the manageability of the class, which can be done by comparing "other means of disposing of the suit to determine if a class action is

27

sufficiently effective to justify the expenditure of the judicial time and energy that is

necessary to adjudicate a class action and to assume the risk of prejudice to the rights of

those who are not directly before the court." *Id.* (quoting *Pipefitters Local 363 Ins. Fund*

*v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630-31 (6th Cir. 2011)). The court

should also consider the value of individual damages, with small awards weighing in

favor of class treatment. *Id.*

      As previously discussed, the question of breach is common to all class members,

and centers on the construction of a single phrase—"per mile"—contained in each of the

putative class members' contracts. Certifying the class will promote the uniform

interpretation of the materially similar contracts and will more efficiently adjudicate the

individual class members' claims, and as of yet there is no evidence in the record

reflecting that the meaning of "per mile" varied from driver to driver. The Court

disagrees with Defendants' assertion that the Court will have to engage in "mini-trials" to

consider what each class member knew and when. Defendants describe their defense of

"actual knowledge" as being based on the fact that drivers were sent "settlement sheets"

that included a breakdown of their compensation and mileage. However, this defense

would apply to all class members, and would be based on the same evidence of

Defendants having provided the pay statements. As such, trying the cases individually

would present the potential for discordant constructions of a uniform contract and the

inefficient presentation of redundant evidence.

      The amount of damages Plaintiff estimates he incurred—$6,372.25—is not a not

de minimis sum, but it is also not substantial considering realistic expenses associating

with pursuing litigation. Also relevant is the nature of the action, which involves individual truck drivers who, by profession, are constantly on the move and have less bargaining power as compared to their employer. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (July 18, 2013) ("Use of the class method is warranted particularly because class members are not likely to file individual actions . . . ."). Therefore, class certification will afford a superior method for addressing the drivers' claims.

      D.    Numerosity

      Plaintiff has met the numerosity requirement by demonstrating that the class is so numerous "that joinder of all members is impracticable." Fed. Rule Civ. P. 23(a)(1). There is no strict numerical cut-off. *Young*, 693 F.3d at 541. Yet, "impracticability of joinder must be positively shown, and cannot be speculative." *Id.* (citing *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005)). "Often, 'a class of 40 or more members is sufficient to meet the numerosity requirement.'" *Dillow v. Home Care Network, Inc.*, No. 1:16-cv-612, 2017 WL 2418738, at *2 (S.D. Ohio June 5, 2017) (quoting *Snelling v. ATC Healthcare Servs. Inc.*, No. 2:11-cv-983, 2012 WL 6042839, at *5 (S.D. Ohio Dec. 4, 2012)); *see also Peterson v. Cleveland Inst. of Art*, No. 1:08-cv-1217, 2011 WL 1297097, at *7 (N.D. Ohio Mar. 31, 2011) (noting Sixth Circuit has previously found class of thirty-five sufficiently numerous) (citing *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1030 (6th Cir. 1977)).

      In a response to an interrogatory, Defendants indicated that "there are approximately 167 individuals who entered into Independent Contractor Driver Policy

29

Agreements that are substantially similar to the one that Plaintiff entered into with

Uzbek," noting that "Uzbek did not implement these Agreements until 2016."  (Doc. 38

at 24; Doc. 44 at 9) (citing Doc. 38-4 at ¶ 4).  This statement refers to the fact that

Plaintiff's contract is of the more formal variety that Otabek instituted some time in 2016.

Thus, the statement reflects that at least 167 drivers shared this particular version of the

contract.  That baseline number is bound to grow by adding in those drivers who had the

less formal versions of the contracts Uzbek Transport and Uzbek Logistics used prior to

2016, which also contained the relevant "per mile" language.  Plaintiff has therefore

demonstrated that the class is so numerous that joinder of all putative class members

would be impracticable.

> E.    Typicality

Federal Rule of Civil Procedure 23(a)(3) requires plaintiffs to demonstrate that

"the claims or defenses of the representative parties are typical of the claims or defenses

of the class."  "Typicality is met if the class members' claims are 'fairly encompassed by

the named plaintiffs' claims.'" (Hendricks v. Total Quality Logistics, LLC, No. 1:10-cv-

649, 2019 WL 2387206, at *7 (S.D. Ohio Mar. 22, 2019) (quoting *Sprague*, 133 F.3d at

399).  The purpose of the requirement is to ensure that the representatives' interests and

the interests of the class members are aligned.  *Id.*  "Many courts have found typicality if

the claims or defenses of the representatives and the members of the class stem from a

single event or a unitary course of conduct, or if they are based on the same legal or

remedial theory."  *Rikos*, 799 F.3d at 509 (quoting *Charles Alan Wright, Arthur R. Miller

& Mary Kay Kane*, 7A Federal Practice and Procedure § 1764 (3d ed. 2005)).  Moreover,

the typicality and commonality analysis "tend to merge," as both "serve as guideposts for

determining whether under the particular circumstances maintenance of a class action is

economical and whether the named plaintiff's claims and the class claims are so

interrelated that the interests of the class members will be fairly and adequately protected

in their absence." *Wal-Mart*, 131 S. Ct. at 2551 n.5.

Here, typicality is met largely for the same reasons Plaintiff has demonstrated

commonality. Plaintiff's claims arise out of a single course of conduct—Defendants'

practice of paying contract drivers based on practical miles rather than actual miles

driven. Each class member will have entered a written contract with Defendants, stating

that pay would be based on a "per mile" rate. Plaintiff's and the class members' claims

also rely on the same legal theory: pursuant to the terms of the contract, Defendants were

required to compensate them based on the actual number of miles they drove.

Defendants' argument that different drivers did not share Plaintiff's interpretation of the

contract based on the deposition testimony of drivers Bay and McCracken fails, because,

as discussed above, these drivers signed a different version of the contract and would not

fall within the class definition.

F.     Adequacy

The adequacy of representation requirement of Rule 23(a)(4) ensures that "the

representative parties will fairly and adequately protect the interests of the class." This

requirement has two components: (1) the representatives must have common interests

with the unnamed class members, and (2) it must appear that the representatives will

vigorously prosecute the class action through qualified counsel. *See Rikos*, No. 1:11-cv-

225, 2018 WL 2009681, at *5 (S.D. Ohio Apr. 30, 2018) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976)).

The named Plaintiff suffered the same alleged injury as the proposed class members, having been paid based on practical miles.  As such, Plaintiff and the putative class members share the same interest.  *See id.*  Defendants do not specifically challenge adequacy, and based on an independent review of the record, the Court finds no reason to suspect a conflict of interest between Plaintiff and the class members.  In addition, Plaintiff is represented by qualified counsel experienced in the work of class action litigation, as demonstrated by counsels' citation to numerous, prior examples of their representation.

G.    Notice

Defendants' noted deficiencies related to Plaintiff's proposed notice have been addressed by Plaintiff's revised class definition.  However, the notice must be amended to reflect the revised class definition.

## CONCLUSION

Based upon the foregoing, Plaintiff's motion for class certification (Doc. 38) is **GRANTED**; accordingly,

1)    The Court certifies the following class:

All drivers who entered into written contracts with Uzbek Logistics, Inc. and/or Uzbek Transport Express, LLC since April 2009 requiring payment on a "per mile" basis.  The class does not include those drivers whose contracts expressly state compensation will be paid "based on practical miles."

2)      The Court hereby appoints Raul Kopaleishvili as class representative and his counsel from the law firms of Croskery Law Offices and Virginia & Ambinder LLP as class counsel.

3)      Plaintiff shall file an amended proposed notice within ten days of entry of this Order reflecting the revised class certified by this Order.

**IT IS SO ORDERED.**

Date:  <u>December 4, 2019</u>                    <u>     *s/ Timothy S. Black*     </u>
                                                Timothy S. Black
                                                United States District Judge

33